Imagine a situation where I send you a letter. Inside the envelope is an instruction that says, please send it on to Chief Judge Michel. Now, those are both destination addresses. It's not, which one are you going to pick? The destination address can be anything along the way that is specifically intended and designated as a stopping point. Common sense, ordinary meaning, unless, and here the only alternative again that was proposed is Vonage's limitation to something on the packet network, which cannot be right under Claim 20 of the 7-11. Let me also make one other point. It truly is not clear, and Vonage has not shown, why this dispute matters for the injunction. Why do I say that? Vonage has identified, and Mr. Warren did today, only one example where he thinks there might be a possibility of non-infringement under his version of destination address, the example where there's the so-called RTP relay in particular calls. The testimony at trial was that that makes up maybe half of Vonage's calls. Excuse me, Mr. Taranto, was there testimony in a trial on the RTP protocol used by Vonage? Substantial? Substantial, yes. Well, that's not part of the record before us, at least. It was never raised or never explained to us. Right, and my point here is it seems to me that Vonage, when it comes to this court for a stay of an injunction, is obliged to say, not only was there an erroneous claim construction, but here's why it makes a difference, why I would be entitled to have that injunction set aside because I would be entitled to have the infringement verdict set aside. I don't think that they've done that at all for destination address as well as for others, but in particular, if the only thing that's at issue is 50% of the calls that go to RTP relay, then there are 50% of the calls that are unaffected by this. Well, they're not asking us to set aside the injunction. They're asking us to stay the injunction only on the ability to provide new clients and solicit new clients prior to the appeal. Right, but they would not be able to overturn on the merits the infringement verdict or the injunction based on it if, as I think is now common ground here, 50% of the calls would be infringing regardless of this claim construction point. There would still be infringement. This was not a call-by-call infringement. There would be infringement. Those infringements would be enjoined, and I don't think they would have much success in getting customers to whom they had to say, by the way, 50% of the calls you may want to make, and we can't even tell you which ones you're not going to be able to make because we can't offer those to you. I don't think that there's anything practical at stake here in the destination address dispute as far as Vonage has shown. I think I've spoken to translating. Let me talk briefly about 711. The destination address is only a 711 point, not a 574 point. So there are really two points for 574, translating, which I've talked about, and the server point. I want to make, I guess, just a couple of points about the server. Here what they're doing is trying to narrow a quite general term to require that term itself to perform certain functions that are specifically called out in other claims or to equate it with the narrower term domain name server. But claims 7 and 13 specifically use domain name server when the patentees wanted to do that. And claim 1, perhaps even more importantly, says a server that, and then it lists a bunch of functions, the very functions that Vonage is talking about. It would mean that claim 1 was nonsensical because if server already required all of those things, then there would be internal redundancy in claim 1. And that's a principle, I think, a quite basic principle of claim construction, even stronger than claim differentiation. One other point I would make about server and why that quite general term in the absence of more limiting language doesn't require these particular functions is at column 15, lines 23 to 42, the specification gives an example where one server receives a request, forwards it on to another for processing. And that's exactly what Vonage is trying to exclude here. You'll notice that in Vonage's reply brief, they say nothing whatsoever about that specific example. So I think that they're unduly narrowing the second point about 574 besides translating. I'd like to talk then, if I could, about the 880. And let me start in the following way. There is no evidence here that any significant harm will come to Vonage because there's no evidence of any significant number of customers that will be covered by the 880. We didn't say that it only covers Wi-Fi. What their experts said was this is basically about Wi-Fi, new on the market. And he pointed to our experts. So it doesn't affect Verizon either, then, if it only covers a small number of customers? I think it is fair to say that there is a kind of equal amount on the two scales. Anything you take off in terms of practical impact from one side of the scale, you're going to be taking off. So you're saying it's not significant for either one of you? Well, I think that's probably right. It's not significant anything like the number of customers that they would be getting if they could offer their basic service. What are the numbers? Well, the Rego deposition, which is still, unfortunately, under protective order, which we attached to our paper, gives a very specific tiny number for the Wi-Fi, but you'll see it also gives a very small percentage number for the cordless phones. Those are the only two numbers that have been put before this court. I've never seen any of these numbers that Mr. Warren was talking about today, about other kinds of devices covered by what is, after all, on its face, a wireless patent. The wireless part of Vonage's business is very, very small. And therefore, the 880 is not of anything like the significance. As far as I can tell, they have made no case that they would be irreparably harmed by the injunction as to the 880. Their irreparable harm claim is about not being able to offer the new customers their basic service because their basic service, the wireline service, requires them to do, as currently configured, apparently, what the 574 covers and what the 711 covers. So, on the 880, there are several issues. The localized wireless gateway system, what the gateway is, the public packet data network. Localized wireless gateway system. They want to introduce a few feet limitation. Now, either that doesn't mean anything that's different from the claim construction, limited or low, in which case there is nothing at stake here. Or, what they must be saying, it has to be limited to some single digit, double digit, I don't know quite what they think it means, but some... We can assume it's well under a few hundred feet. Or at least well under a thousand feet. I'm not quite sure what the full range of the devices that they sell are. What do they rely on? They can't say, and they don't say, that the claim language calls for this. They, I think, not only don't say, but conceded this morning, that the specification doesn't call for some single digit or double digit few feet limitation. They are making a clear disavowal argument based on the prosecution history. What is the prosecution history? It is not of the 880. The prosecution history statement that they rely on was made after the 880 issued in the division, in the 497, the application that led to the 497. The 880 is a divisional of that. And at the tail end of that prosecution history, the applicants, not again for the 880, but for the 497, use the language that you pointed, that was discussed earlier this morning. My point, I guess, would be this. How would a person of skill in the art understand the language? They point to two passages. One of them explicitly just says, for example. And so it's not restrictive at all, the page 3 passage. And then there's the page 5 passage, the in the sense of passage. Either in the sense of there just means, again, for example. Or, I think, a person of skill in the art would understand that distinction, the distinction that was being made there to be nothing other than the very same distinction that was made in the specification. We're talking about an island-like wireless system, not blanket coverage. The blanket coverage system is cellular systems where you can take your phone and seamlessly go wirelessly across large, large areas. What about the voice compression argument? And you're saying that the present invention language doesn't cabinet. I mean, isn't there reliance on the present invention language, at least a substantial argument, in favor of cabining it in a way that, if they were successful, would require at least a new trial? I don't think so. And one of the reasons is that there is a specific example in the specification, which I miscited in my opposition. I sent a letter to the court yesterday. I hope you all got it. It gives the correct sign. It's not column 8, 57 to 64. It's column 6, lines 57 to 64, which specifically says, by the way, the decompression function can, of course, be performed by the user's device. It doesn't have to be performed, therefore, by the gateway. They don't dispute that a gateway is an ordinarily understood term, quite broad term. In fact, the definition that they propose itself used the term gateway and then said, but this particular gateway has to do these functions. So the dispute here is they say present invention. You admit that the present invention language seems to limit it, but you'd say it can't be interpreted that way because of this example that you just referred to. I think I probably wouldn't use the seems to limit it. What I would say is that present invention language in specifications has been the subject of a large number of opinions of this court, and sometimes it points very strongly toward limiting, and sometimes it doesn't. It depends on the context. They'd have a pretty good argument, wouldn't you agree, from the present invention language, if it weren't for this example that you're relying on? I don't think so because I think you would still go to the ordinary, broad meaning of gateway. No dispute that that's something that performs certain interfacing functions in effect without designating a particular list of interfacing functions. It serves between the public packet data network and the public switch telephone network and can do any number of different things, but I don't think that unless this court were, for the first time, I think, to adopt a rule that says present invention language, even when not followed by requires or a word as strong as requires, limits an ordinary meaning, then I think they wouldn't be able to, I'm not sure what your term was, fair question? I think actually fair question was the term that in standard havens the court specifically said that's not quite high enough on the state standard. This has to be more than a fair question to be a substantial question. I think at this point we'd probably be slicing the salami a little bit too thin to figure out exactly what a substantial question is, but what we have here is an ordinary term of great breadth plus a specific specification example at column 6, lines 57 and 64 that contemplates that these very functions can be done by the end user's equipment and therefore of course don't have to be done by the interfacing equipment in the network, namely the gateway. Let me talk, if I can briefly, about packet data network. But isn't really Vonage's basic argument that the packeting must occur at the gateway and not at the phone end? That is their argument. What I'm suggesting is that in fact that is reading in a limitation into this broad term gateway that it is improper to read in because the broad term, as I think they would have to, in fact do concede by not challenging it, the broad term gateway by itself doesn't require that particular function of packetizing or compression. They want to say because the specification talks about that function and uses the language of present invention, though not with requires or anything that strong, that it therefore has to be added. Remember, their proposed definition was this gateway is a gateway that compresses. Gateway is even part of their definition, so it can't itself require even in their view that concept. They're adding it in by the specification. How is this inconsistent with the example that you just gave? Show me if you would. In column six you say lines 57 to 64. Why is that inconsistent with what they're saying? It talks about the CPUs in such PCs run software for compression and decompression of digitized audio, typically voice information. If that function is being performed at the end user, it doesn't have to be and wouldn't be performed at the gateway. The gateway would already have been performed before the communication stream gets to the gateway. Did any witness explain this? I don't recall, I'm afraid. You're saying under that language the packet needs to be performed before it gets to the gateway? This talks, yes, about how the PCs, the end user's equipment, is doing the compression and decompression of the digitized audio. If I could speak briefly about the packet data network. First thing I want to say, this is the one where they're trying not to narrow the claim language but to broaden it. They have some idea evidently that if they can broaden it, there must be some prior art that would involve non-packet switch network that would therefore invalidate it. First thing I want to say is this. I don't understand how this can matter to the 880. This is an argument only about Claim 1 of the 880. They have been found to infringe Claims 6, 7, and 8 and enjoined from practicing Claims 6, 7, and 8, which do involve by their terms packet switch network. No reason whatsoever to think that the injunction as to Claim 1 is any different in impact than the injunction as to Claim 6, 7, and 8 because they, after all, do use the Internet, the packet switch network. So I don't understand how this can matter at all, this whole argument for the 880 injunction. What invalidity issues were raised below? The jury verdict included one on invalidity.  There was an invalidity argument about 711 and 574, either entirely or almost entirely focused on a particular patent application called the Jonas application. On the 880, it was, depending on how you count, one or two pieces of prior art involving a system that was put in place at Harvard some years ago. None of those for the 880, yes, it's also true for the Jonas and 571 and 574, involved the public switch telephone network. They may have in mind some other prior art, which they haven't identified in this court, that might involve the public switch telephone network and yet do the things that the 880 claims. There was a suggestion before the trial that they had in mind something over so-called ATM networks. They never brought that up at trial. They haven't identified it here. It's possible that's because their own expert said, actually the ATM network is a lot more like a packet switch network than a public switch network, so that probably would cut into their ability to argue this is actually a counter-insurance. So we don't really know, and I'm telling you some of the background about what they might have been thinking, but they haven't identified it. And that's the second point. They failed to identify why even as to claim one this dispute would matter. And the other point I would then make is that their only real argument is a claim differentiation argument. Claim one uses public data network, packet data network, and 678 say public switch data network. What is the difference? Well, you could conceivably. I mean, who knows exactly what it could be. This is probably one of those instances. In fact, in the context of this specification, it is one of those instances where they use two slightly different terms in order to capture the same thing. And the same thing is the thing that's different from the public switch telephone network. The entire specification is about a contrast between two different things over and over again. That doesn't explain the difference, though. No, I mean the basic difference between the two networks, the difference between the two. What is the basic difference between the public packet data communications network and the packet switch network? I don't think that there is a difference in this patent. The patent interchangeably, over and over again, uses the same terms back and forth. There's nothing in this specification that says, here's the kind of thing that we have in mind for a public packet data network that doesn't involve packet switching. No identification of that. They just use the terms, as I say, interchangeably throughout. So claim six then covers the same as claim one. Yes, it would. In this patent, I don't understand what the specification, I think, makes clear, to put it more affirmatively, that there is no difference between those two things. So I guess I would conclude with just asking this court to consider the patents one by one. There are two claim construction issues that if the court, translating and server, that if the court, I think, follows the basic rules about waiver or the ordinary meeting, take care of the 574. They mean those that Vonage has not presented a substantial question of claim construction error on those two issues, and therefore on the 574, add to that destination address for the 711, and then turn, and therefore the 711 injunction shouldn't be disturbed. And separately from that, then, the 880 issues, I think they haven't presented substantial questions on those. But in any event, they haven't presented any case for irreparable harm on those. Thank you. Mr. Warren, five minutes. Thank you, Your Honor. I'd like to address briefly harm. Is Mr. Cronin correct that the destination address doesn't help you on the 574? It has destination telephone number on the 574 as opposed to destination address. He is right that that is a distinction between the two. But does the destination address argument that you're making help you on the 574? No. No. I'd like to address briefly some of the issues I didn't get addressed the first time with respect to the harm. The standard humans case makes it clear in the context of an injunction and a statement, which is what we're here on today, that if we meet those four factors, that the court can consider issuing a state. We want the state to This is rebuttal argument. Yes, he talked about standard havens, and that's why he began his argument. He certainly mentioned standard havens, but this isn't the time to bring up new points that you didn't cover in your initial argument. If you're rebutting something he said, it's entirely proper. But if you're trying to supplement what you said in the very expanded time we gave you, it's sort of not proper. I didn't think I was doing that, Your Honor. He began his argument by saying this case is very different from standard havens. And then he recited three or four reasons why. And all I was going to try to do is to say why it was similar to standard havens. Proceed. That the situation here is that Vonage, like standard havens, has introduced evidence, including its most recent securities filings, that if a stay is not granted with respect to acquiring new customers, that the continuing viability of the company is threatened. That is consistent with the fact pattern of standard havens, which this court considered important. He talked about in that situation there was no bond. And, in fact, he is right, but I think it cuts the other way. The injunction here is against new customers. And Verizon claims to meet the third standard, the third factor standard havens, that it will suffer harm as a result of losing customers while the injunction, while the appeal goes forward. In fact, Verizon's own testimony below indicated that 74% of the customers that Vonage have come from someone other than Verizon. This court, the trial court, has imposed a 5.5% royalty on all sales. So if this court extends the stay, those customers that will come to Vonage during the period of the stay from other telephone companies, the 74%, according to Verizon, Verizon will be getting revenue, not losing revenue. It will be getting a 5.5% royalty on customers it doesn't have. And so the notion that allowing us to acquire new customers during the period of the stay would hurt Verizon is, in fact, contradicted by the terms that the trial court imposed, which says that the injunction would remain in effect in the stay of it only so long as we paid those funds into the escrow of the court. And so if the court gets into the standard havens balancing of harms, on one side you've got the real risk of insolvency on the part of Vonage, while trying to go forward with the merits of this case and the issues. On the other side, the harm that Verizon has identified is that during dependency of the appeal, they may lose some customers and may have lost profits. And the evidence in the record actually indicates that they will acquire additional revenues from not their customers, the new customers that we would be allowed to obtain during that time period. Before you sit down, what's your response to Mr. Toronto's reference of the 880 patent to column six, lines 57 to 64, as showing that the waste compression doesn't have to be at the gateway? Those, I am told, that I've consulted, my technical consultants, are not part of the gateway system. So in describing what he described, I'm trying to describe something that differs from what's described in the text of the specifications. Thank you very much. Thank you. We'll take the motion under advisory. All rise.